[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 592 
 On Certiorari to the Utah Court of Appeals
¶ 1 This case concerns the standard for determining the reasonableness of a protective frisk ("Terry frisk") for weapons. At trial, the defendant, Eric Jarvis Warren, filed a motion to suppress evidence obtained in a Terry frisk performed during a routine traffic stop. Although the officer who performed the frisk testified that he had no reason to believe Warren was armed and dangerous, the trial court denied the motion, finding that a reasonable person facing the same circumstances could objectively conclude that Warren was armed and dangerous. On appeal, the court of appeals reversed the trial court's decision, relying on the officer's lack of subjective belief and finding the frisk to be objectively unreasonable. We affirm the decision of the court of appeals, but clarify that an objective standard must be applied to determine the reasonableness of a Terry frisk under the totality of the circumstances. The officer's subjective belief may nevertheless be factored into the objective analysis, though it is never alone determinative. Likewise, we clarify that all traffic stops are inherently dangerous, a fact that should also be included in the totality of the circumstances analysis. However, any reduction in this danger resulting from ordering the person out of the vehicle before performing the frisk should also be factored into the analysis. Based on an objective evaluation of the totality of the circumstances present in this case, we conclude that the Terry frisk in question violated Warren's Fourth Amendment rights.
 BACKGROUND ¶ 2 We recite the facts in detail because the legal analysis in a search and seizure case is highly fact dependent. State v. Hansen,2002 UT 125, ¶ 5, 63 P.3d 650 (citations omitted). In order to provide a thorough recitation of the facts, we supplement the trial court's findings of fact with relevant testimony given by Officer Nathan Swensen during an evidentiary hearing held on February 18, 2000.
 ¶ 3 At approximately 4:45 a.m. on November 28, 1999, Officer Swensen observed an unidentified male leaning into an open passenger door of a parked car near the intersection of 200 So. and 200 East in downtown Salt Lake City. Warren was seated in the driver's seat. Officer Swensen turned his vehicle around and stopped at the intersection to investigate. He did not recognize the car or know either Warren or the person leaning into the vehicle. He was also unable to tell what they were doing or hear their conversation. Officer Swensen suspected drug activity or prostitution based on the hour of the day and the deserted downtown location.[1] After watching the proceedings for less than a minute, Officer Swensen observed the person who was leaning into the passenger door shut the door and leave on foot.
 ¶ 4 Warren pulled away from the curb and turned left at the intersection without signaling and then made a lane change without signaling. Officer Swensen pulled Warren's car over for failure to signal. He asked Warren for his driver's license, vehicle registration, and proof of insurance. Warren provided the vehicle registration and a driver's license that had expired in 1995, claiming that he had a current license but that it had been stolen. Officer Swensen then asked Warren several questions regarding his activities with the man leaning into the car. Warren responded that he had just dropped off a friend and was looking for boxes to help *Page 593 
his sister move. These additional questions extended the stop approximately a minute or two.
 ¶ 5 Officer Swensen returned to his police car to check the status of Warren's license. The search revealed that Warren did have a license that was valid until 2001, but that it was now invalid because of unpaid reinstatement fees. Officer Swensen decided to impound the vehicle and asked Warren to step out of his vehicle and over to the patrol car to sign the citation for failure to signal and for driving without a valid license. Officer Swensen testified that he did not intend to arrest Warren and that Warren would have been free to go after signing the citation.
 ¶ 6 After Warren exited the vehicle, Officer Swensen asked him if he had any weapons. Warren responded that he did not. Officer Swensen testified that he did not have any reason to believe that Warren was armed. He also testified that Warren did not do anything that caused him any concern. Nevertheless, Officer Swensen decided to perform a Terry
frisk for weapons. He testified that to promote the safety of officers and others, he performs a Terry frisk as a matter of routine on anyone he orders out of a vehicle. Officer Swensen also testified that people involved in drug activity or prostitution are more likely to carry weapons.
 ¶ 7 During the frisk, a small white twist, later identified as cocaine, fell from underneath Warren's sweatshirt. Believing the twist to contain a controlled substance, Officer Swensen placed Warren under arrest. A more thorough search of Warren's person incident to his arrest revealed additional controlled substances and drug paraphernalia. A search of Warren's vehicle also revealed drug paraphernalia, as well as a knife concealed under the armrest of the front seat.
 PROCEDURAL HISTORY ¶ 8 Based on these events, Warren was charged with unlawful possession of a controlled substance, carrying a concealed dangerous weapon, and unlawful possession of drug paraphernalia. Warren moved to suppress the evidence, claiming that the scope of the detention exceeded the purpose of the stop and that Officer Swensen did not have a reasonable belief on which to justify the frisk. Following an evidentiary hearing and oral argument, the trial court denied Warren's motion and entered Findings of Fact and Conclusions of Law. The trial court held that the additional questioning did not impermissibly extend the scope of the stop in violation of the Fourth Amendment. The trial court also held that the frisk for weapons did not violate the Fourth Amendment because it was objectively reasonable.
 ¶ 9 Warren entered a conditional guilty plea to the cocaine charge, while retaining the right to appeal the denial of his motion to suppress evidence. Upon the entry of this plea, the State, as agreed, dropped all other charges. On appeal, the court of appeals reversed the denial of the motion to suppress, holding that the frisk was unlawful because Officer Swensen "did not believe, and had no basis on which to reasonably conclude, that Warren might be armed" and dangerous. State v.Warren, 2001 UT App 346, ¶ 22, 37 P.3d 270. The court also held that the State failed to meet its burden of establishing the inevitable discovery of the evidence. Id. Having concluded that the frisk was unlawful, the court did not address whether Officer Swensen's additional questioning impermissibly extended the scope of the stop. Id.
at ¶ 16 n. 5.
 ¶ 10 The State petitioned for certiorari review, which we granted on April 10, 2002. We have jurisdiction to hear this case pursuant to Utah Code Ann. § 78-2-2(3)(a) (2002).
 ANALYSIS ¶ 11 The State argues that the court of appeals failed to perform a totality of the circumstances analysis, but instead evaluated the articulable facts independently. The State also argues that the court of appeals' failure to recognize the fact that all traffic stops are inherently dangerous sends a conflicting message to lower courts. Warren contends that the court of appeals' decision is proper based on both the officer's lack of subjective belief that Warren was armed and dangerous and the objective unreasonableness of the officer's decision to perform the frisk. *Page 594 
 I. STANDARD OF REVIEW ¶ 12 "When exercising our certiorari jurisdiction, we review the decision of the court of appeals and not that of the trial court." Statev. Hansen, 2002 UT 125, ¶ 25, 63 P.3d 650 (quotation and citation omitted). "We review the decision of the court of appeals for correctness." Id. (quotation and citation omitted). When a case involves the reasonableness of a search and seizure, "we afford little discretion to the district court because there must be state-wide standards that guide law enforcement and prosecutorial officials." Id. at ¶ 26 (quotation and citation omitted). "State-wide standards also help ensure different trial judges will reach the same legal conclusion in cases that have little factual difference." Id. (citation omitted).
 II. ORIGIN AND LIMITS OF TERRY FRISKS ¶ 13 In Terry v. Ohio, the United States Supreme Court held that an officer may perform a protective frisk pursuant to a lawful stop when the officer reasonably believes a person is "armed and presently dangerous to the officer or others." 392 U.S. 1, 24 (1968).[2] The Court further cautioned that a search "is a serious intrusion upon the sanctity of the person" and should not be taken lightly. Id. at 17. The officer must first have a valid reason for stopping the person, and the officer's subsequent actions must be "reasonably related in scope to the circumstances" justifying the stop. Id. at 19-20; State v. Kohl,2000 UT 35, ¶ 10, 999 P.2d 7. The sole purpose for allowing the frisk is to protect the officer and other prospective victims by neutralizing potential weapons. Michigan v. Long, 463 U.S. 1032, 1049
n. 14 (1983); Terry, 392 U.S. at 24. "If a protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under Terry and its fruits will be suppressed." Minnesota v.Dickerson, 508 U.S. 366, 373 (1993) (citing Sibron v. New York,392 U.S. 40, 65-66 (1968)).
 ¶ 14 The reasonableness of both the stop and the frisk are evaluated objectively according to the totality of the circumstances.Terry, 392 U.S. at 21. To determine reasonableness, a court should question whether "the facts available to the officer at the moment of the seizure or the search `warrant a man of reasonable caution in the belief' that the action taken was appropriate." Id. at 21-22 (citations omitted). The Terry court proclaimed that the officer must be able to point to specific facts which, considered with rational inferences from those facts, reasonably warrant the intrusion. Id. at 21. In determining reasonableness, "due weight must be given, not to [an officer's] inchoate and unparticularized suspicion or `hunch,' but to specific reasonable inferences which [an officer] is entitled to draw from the facts in light of his experience." Id. at 27. The Court later explained that this process allows officers to draw upon their own experience and training to make determinations based on the cumulative facts before them that may elude an untrained person. United States v. Arvizu, 534 U.S. 266, 273
(2002). Courts must view the articulable facts in their totality and avoid the temptation to divide the facts and evaluate them in isolation from each other. Id. at 274 (holding that Terry precludes a divide and conquer analysis).
 III. SUBJECTIVE BELIEF AS PART OF THE OBJECTIVE ANALYSIS ¶ 15 The court of appeals in this case noted that the officer's lack of subjective belief clearly took the frisk "outside of Terry's limited justification for warrantless searches." State v. Warren,2001 UT App 346, ¶ 16, 37 P.3d 270. This language could *Page 595 
be interpreted as a per se invalidation of the frisk based solely on the officer's subjective belief. Per se invalidation of a Terry frisk based solely on a lack of subjective belief is clearly a minority view, and a view with which we disagree. We hold that courts must objectively evaluate a Terry frisk, but the officer's subjective belief may be a factor in the objective analysis. Because it is unclear how much the court of appeals relied on the officer's subjective belief in invalidating the frisk, we will now reevaluate the totality of the circumstances based on an objective standard.
 A. Objective Analysis ¶ 16 The United States Supreme Court in Terry stated that an officer's subjective belief that a suspect is armed and dangerous is not enough alone to justify a protective frisk, but the Court has not yet determined what role an officer's lack of subjective belief plays in the analysis when reasonable suspicion is required. 392 U.S. at 22. When probable cause is required, the Court has held that a lack of subjective belief cannot invalidate an otherwise objectively reasonable action.[3]
The Court in Terry did state that an officer must justify the intrusion by pointing to articulable facts that warrant the intrusion when viewed under the totality of the circumstances. Id. at 21. Thus, it appears that a Terry frisk should be measured by an objective standard. Likewise, our previous case law mandates an objective analysis, though we have not previously addressed the implications of an officer's lack of subjective belief in the Terry frisk context. State v. Roybal, 716 P.2d 291, 293
(Utah 1986); State v. Carter, 707 P.2d 656, 659 (Utah 1985). We now discuss whether an officer's subjective belief may be a factor to consider in the objective analysis to determine whether a Terry frisk was reasonable.
1. Majority View
 ¶ 17 The majority of jurisdictions that have addressed the issue of an officer's lack of subjective belief have upheld a Terry frisk or aTerry stop as long as the Terry frisk or stop was objectively reasonable. United States v. Holt, 264 F.3d 1215, 1225 (10th Cir. 2001) (per curiam) (explaining that subjective intentions rarely play a role in a Fourth Amendment analysis and that courts instead rely on an objective view of the circumstances); United States v. Brown, 232 F.3d 589, 594
(7th Cir. 2000) (holding that courts are not limited to the officer's subjective rationale); United States v. Michelletti, 13 F.3d 838, 842
(5th Cir. 1994) (approving a Terry frisk under an objective standard, notwithstanding the fact that the officer stated he had no specific reason to believe the defendant was armed); United States v. McKie,951 F.2d 399, 402 (D.C. Cir. 1991) (per curiam) (holding that the court is not limited by subjective rationale, but determines reasonableness objectively); United States v. Cummins, 920 F.2d 498, 502 (8th Cir. 1990) (finding a Terry search objectively reasonable, notwithstanding the officer's lack of subjective belief that the defendants were armed and dangerous).
2. Minority View
 ¶ 18 On the other hand, a minority of jurisdictions evaluate aTerry frisk according to the officer's subjective belief. United Statesv. Lott, 870 F.2d 778, 783-84 (1st Cir. 1989) ("[W]e do not read [Terry
and Long] as permitting a frisk where, although the circumstances might pass an objective test, the officers in the field were not actually
concerned for their safety."); United States v. Prim, 698 F.2d 972, 975
(9th Cir. 1983) (holding that an objective standard is applied to the officer's actual or perceived belief).
 ¶ 19 We concur with the majority of jurisdictions in holding that the reasonableness *Page 596 
of a Terry frisk must be evaluated objectively. Furthermore, an officer's lack of subjective belief alone does not invalidate an otherwise objectively reasonable Terry frisk. We do not, however, go so far as to hold that an officer's subjective belief plays no role in the analysis.
 B. Role of Subjective Belief ¶ 20 Though an officer's subjective belief alone is insufficient to validate or invalidate a Terry frisk, to completely disregard an officer's subjective belief excludes a potentially important element of the analysis. In stating that subjective belief alone is not enough to justify a frisk, the United States Supreme Court appears to recognize that subjective belief may be one of the factors in determining the reasonableness of an officer's decision to perform a Terry frisk. Terry,392 U.S. at 22. In fact, in other situations, an officer's subjective factual determination based on experience and specialized training has been given due weight as part of the objective analysis. United Statesv. Arvizu, 534 U.S. 266, 273 (2002). In Arvizu, an officer evaluated facially neutral facts to develop a reasonable suspicion that a family driving a van was involved in illegal drug smuggling. Id. at 270-71. The Court considered the officer's subjective interpretation of the facts as part of the totality of the circumstances. Id. at 277. Thus, the Court has demonstrated that there are subjective elements that may be considered in an otherwise objective analysis.
 ¶ 21 The totality of the circumstances analysis objectively evaluates all facts before the officer at the time the officer made the decision. The officer, with experience and training, is in the best position to evaluate the circumstances and determine the reasonableness of a Terry frisk. We recognize that some officers may never admit that they feared for their safety. Holt, 264 F.3d at 1225-26. Likewise, other officers may always claim they believed a stop was dangerous in order to justify a frisk. Nevertheless, an officer's own evaluation of the circumstances may provide valuable insight to factor into the objective analysis. How much weight this factor is given is a determination for the individual court, though a Terry frisk cannot be validated or invalidated based solely on a subjective belief because no one factor alone is determinative of reasonableness. Carter, 707 P.2d at 659. An officer's determination that a person may be armed and dangerous, like an officer's subjective interpretation of the facts to determine that a crime has been or is being committed, is one of several possible articulable facts a court may consider as part of the totality of the circumstances.
 IV. THE INHERENT DANGEROUSNESS OF TRAFFIC STOPS AS PART OF THE TOTALITY OF THE CIRCUMSTANCES ¶ 22 The State argues that the court of appeals' analysis was flawed because it failed to consider the fact that all traffic stops are inherently dangerous. Though the court of appeals did not affirmatively disclaim the inherent dangerousness of traffic stops, we hereby clarify the principle that the inherent dangerousness of all traffic stops is a factor to be considered in the totality of the circumstances analysis. However, this danger can be fully or partially mitigated by ordering the occupants out of the vehicle. Thus, both the inherent dangerousness of the traffic stop and any reduction in that danger resulting from ordering the occupants out of the vehicle should be factored into the totality of the circumstances analysis.
 A. Inherent Dangerousness of Traffic Stops ¶ 23 In State v. James, we noted that there are inherent safety concerns in all traffic stops. 2000 UT 80, ¶ 10, 13 P.3d 576. We explained that officer safety is "an inherent aspect of the governing caselaw, which we are not at liberty to disregard." Id. at ¶ 10 n. 3. The United States Supreme Court has also considered the dangerousness inherent in traffic stops, noting that officers face an inordinate risk when approaching a person seated in an automobile. Michigan v. Long,463 U.S. 1032, 1048 (1983). In addition, the Tenth Circuit recently explained, "[t]he terrifying *Page 597 
truth is that officers face a very real risk of being assaulted with a dangerous weapon each time they stop a vehicle. . . . [C]ourts have been willing to give the officers `wide latitude' to discern the threat the motorist may pose to officer safety."United States v. Holt, 264 F.3d 1215, 1223 (10th Cir. 2001) (citation omitted).
 ¶ 24 Due to this inherent dangerousness, courts allow officers to take certain precautions to protect themselves without having to justify their actions based on reasonable suspicion. The United States Supreme Court in Pennsylvania v. Mimms held that once a motor vehicle has been lawfully detained for a traffic violation, police officers may order the driver out of the vehicle to promote safety, even in the absence of reasonable suspicion, without violating the Fourth Amendment's proscription against unreasonable searches and seizures. 434 U.S. 106,108-111 (1977). The Court later clarified that this same rationale also allows officers to order passengers out of the vehicle. Maryland v.Wilson, 519 U.S. 408, 410 (1997). Officers can also run background checks pursuant to a traffic stop in order to increase officer safety. Holt,264 F.3d at 1221. Officer safety is so important that all federal and most state courts allow these actions even in the absence of any specific safety concern.[4]
 ¶ 25 Although society's interest in promoting officer safety is great, that interest must be weighed against society's interest in protecting individual liberty. The reasonableness of a Terry frisk depends "on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers."United States v. Brignoni-Ponce, 422 U.S. 873, 878 (1975) (citation omitted). Balancing these interests, courts have held that slight intrusions such as ordering a person out of a car or conducting background checks pursuant to a traffic stop are justifiable intrusions in order to allow officers to operate in safety. See Mimms,434 U.S. at 111; Wilson, 519 U.S. at 410; Holt, 264 F.3d at 1221. A Terry frisk is an intrusion of a greater magnitude. As the Court noted in Terry, a Terry
frisk "may inflict great indignity and arouse strong resentment, and it is not to be undertaken lightly." Terry, 392 U.S. at 17. Hence, we expressly note that the State has not argued, and we do not hold, that the inherent dangerousness of traffic stops alone justifies a Terry
frisk. However, we agree with the State that the inherent dangerousness of all traffic stops is a factor that should be considered under the totality of the circumstances analysis.
 B. Inherent Dangerousness of Traffic Stops As an Element of the Totality of the Circumstances ¶ 26 Traffic stops are analogous to Terry stops, which are justified on the basis of reasonable suspicion rather than probable cause. Berkemer v. McCarty, 468 U.S. 420, 439 (1984). A significant difference, however, between a pedestrian stop and a traffic stop is the unknowns presented by the vehicle itself. A vehicle has hidden compartments and the potential to hide the suspect's actions from the officer's view. Thus, the inherent dangerousness of traffic stops discussed above is directly tied to a person's occupancy of, and potential access to, the vehicle. See Long, 463 U.S. at 1049.
 ¶ 27 It stands to reason, therefore, that if a person is ordered out of a vehicle, some or all of the inherent dangerousness of a traffic stop may be mitigated. To perform a Terry frisk, an officer must order the occupants from the vehicle. As the United States Supreme Court explained, "[e]stablishing a face-to-face confrontation diminishes the possibility, otherwise substantial, that the driver can make unobserved movements; this, in turn, reduces the likelihood that the officer will be the victim of an assault." Mimms, 434 U.S. at 110. In extending *Page 598 Mimms to passengers, the Court later explained, "[o]utside the car, the passengers will be denied access to any possible weapon that might be concealed in the interior of the passenger compartment." Wilson, 519 U.S. at 414. In simple traffic stops where other indicia of dangerousness are absent, ordering the occupants of the vehicle out of the car clearly mitigates the inherent dangerousness of the stop.
 ¶ 28 This is not to say that officers must always order occupants out of a vehicle to minimize danger to themselves or others or that officers must adopt alternative means to increase their safety in order to avoid the intrusions involved in a Terry encounter. Long,463 U.S. at 1052. Nor do we believe that ordering occupants out of a vehicle during a traffic stop will necessarily eliminate all danger. As the Supreme Court has also noted, a suspect may still gain access to a vehicle even after the officer orders the suspect out of the vehicle. Id. at 1051-52. Thus, while we recognize that the inherent dangerousness of traffic stops may be mitigated by ordering the occupants out of the vehicle, we also note that some danger related to potential access to the vehicle may remain.
 ¶ 29 Because ordering the occupants out of the vehicle may remove or substantially reduce the inherent dangerousness of a traffic stop, both the inherent dangerousness of a traffic stop and any decrease in danger from ordering a suspect from a vehicle are factors that should be considered under the totality of the circumstances. We reiterate that even when not mitigated, the inherent dangerousness of a traffic stop alone is not determinative. The officer must still meet the requirements of Terry by pointing to "`specific and articulable facts which, taken together with the rational inferences from those facts,'" would lead a reasonable person to conclude that the suspect may be armed and presently dangerous. Long, 463 U.S. at 1049 (quoting Terry, 392 U.S. at 21).
 V. EVALUATION OF THE TOTALITY OF THE CIRCUMSTANCES IN THIS CASE ¶ 30 Having clarified the analysis for evaluating the reasonableness of a Terry frisk, we now turn to the court of appeals' decision. The State argues that the court of appeals did not conduct a totality-of-the-circumstances analysis but viewed the articulable facts in isolation from each other. While, in our view, the court of appeals did conduct a totality-of-the-circumstances analysis, that analysis is admittedly sparse. The court of appeals discussed at length the difference between stops where Terry frisks are essentially permitted per se and stops, such as the one in this case, that require additional articulable facts to prove reasonableness. Warren, 2001 UT App 346
at ¶ 5. Although the stop in this case required additional articulable facts to prove reasonableness, the court of appeals' analysis of the facts is found within a single brief footnote. Id. at ¶ 16 n. 4. Because this case is a difficult one, we believe it warrants more explanation than that found in the footnote.
 ¶ 31 "The touchstone of our analysis under the Fourth Amendment is always `the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.'" Pennsylvaniav. Mimms, 434 U.S. 106, 108-09 (1977) (quoting Terry, 392 U.S. at 19). Reasonableness depends "on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." United States v. Brignoni-Ponce, 422 U.S. 873, 878
(1975) (citation omitted). Courts consistently eschew bright-line rules and "instead emphasiz[e] the fact-specific nature of the reasonableness inquiry." Ohio v. Robinette, 519 U.S. 33, 39 (1996).
 ¶ 32 Here, the court of appeals stated that lesser traffic offenses are not suggestive of weapons and that neither the lateness of the hour nor Warren's lie regarding his license was suggestive of weapons. There are, however, several other articulable facts on both sides of the scale that the court should have weighed in determining reasonableness. On the one hand, the reasonableness of the Terry frisk is supported by the inherent dangerousness of a traffic stop, the lateness of the hour, the deserted downtown location, the lie *Page 599 
by Warren regarding the status of his license, the need to impound Warren's car, and Officer Swensen's suspicion that Warren was involved in drug activity or prostitution. On the other hand, a number of factors weigh against the reasonableness of the Terry frisk, including Warren's cooperative behavior, his response that he did not have any weapons on him, his willing compliance with the order to exit his vehicle, and Officer Swensen's testimony that Warren did nothing to cause Officer Swensen to be alarmed and that he had no reason to believe that Warren was armed and dangerous.
 ¶ 33 Clearly, this case lacks the kind of obvious articulable facts that would make the determination easier, such as a bulge in a pocket, a sudden lunge, or loud and boisterous behavior.[5] However, we conclude that the factors supporting the reasonableness of the frisk are insufficient in this case. In particular, we note that Officer Swensen's suspicions of drug activity or prostitution are better classified as hunches, rather than reasonable inferences, especially in light of the fact that he did not consider them sufficient, standing alone, to warrant investigation. Instead, he waited until Warren committed traffic violations to justify the stop. In Terry, the Court stated that credence must not be given to hunches, but to specific reasonable inferences an officer is entitled to draw from the facts in light of his or her experience. 392 U.S. at 27. While respecting an officer's entitlement to draw upon his or her experience, the facts leading to Officer Swensen's suspicion are too attenuated to justify the inference. Similarly, Warren's cooperativeness, denial of being armed, and the absence of alarming actions further negate the reasonableness argument. In addition, Officer Swensen was present and observed all the factors, but testified repeatedly that he did not have any reason to believe that Warren was armed and dangerous. Finally, Officer Swensen's removal of Warren from the vehicle decreased the inherent dangerousness of the traffic stop. After weighing all of the articulable facts, we conclude that the officer's safety concerns in this case were not sufficient to outweigh Warren's right to personal security.
 CONCLUSION ¶ 34 We affirm the court of appeals' conclusion that the motion to suppress evidence should have been granted. We clarify that the reasonableness of a Terry frisk is evaluated using an objective standard, but the officer's subjective belief may be factored into the objective analysis. We also clarify that all traffic stops are inherently dangerous, but the specific dangerousness inherent in all traffic stops can be fully or partially mitigated by ordering the person out of the vehicle. Since Terry frisks are performed after the occupant exits the vehicle, both the inherent dangerousness of the traffic stop and any reduction in danger resulting from a person exiting the vehicle should be factored into the totality of the circumstances analysis. Based on an objective evaluation of the totality of the circumstances present in this case, we conclude that the Terry frisk in question violated Warren's Fourth Amendment rights.
 ¶ 35 The court of appeals' decision is affirmed.
 ¶ 36 Chief Justice Durham, Justice Wilkins, Justice Parrish, and Justice Nehring concur in Associate Chief Justice Durrant's opinion.
[1] Officer Swensen testified the area was not residential and that there were no businesses open in the area at that hour.
[2] We note that section 77-7-16 of the Utah Code addresses protective frisks, providing that "[a] peace officer who has stopped a person temporarily for questioning may frisk the person for a dangerous weapon if he reasonably believes he or any other person is in danger." Utah Code Ann. § 77-7-16 (1999). As we have previously stated, this section of the code is subject to the constitutional requirements of Terry. SeeState v. Roybal, 716 P.2d 291, 292 (Utah 1986).
[3] Whren v. United States, 517 U.S. 806, 813 (1996) (holding that previous case law forecloses any argument that the reasonableness of a traffic stop depends upon the subjective intent of the individual officers); Scott v. United States, 436 U.S. 128, 138 (1978) (holding that subjective belief does not invalidate otherwise objectively justifiable actions); United States v. Robinson, 414 U.S. 218, 236 (1973) (holding that a lack of subjective intent does not limit a search in a custodial arrest situation because the custodial arrest alone grants authority to search).
[4] The Massachusetts Supreme Court distinguished Massachusetts from federal and other state jurisdictions by validating a state statute ensuring that citizens do not have to leave the vehicle unless the officer reasonably believes the officer's safety is in danger.Commonwealth v. Torres, 745 N.E.2d 945 (2001).
[5] Courts frequently cite Wayne R. LaFave's treatise on the Fourth Amendment regarding searches and seizures. LaFave suggests there must be something more than darkness or location that would cause an officer to reasonably believe a suspect is armed and dangerous, such as the following: "a sudden and otherwise inexplicable move toward a pocket or other place where a weapon may be concealed;" a failure by the suspect "to respond to the officer's directive that he remove his hands from his pocket;" "a characteristic bulge in the [suspect's] clothing;" "a `boisterous [or] aggressive' attitude" by the suspect; "previously obtained information that this person carried a weapon;" or something "in addition to the minor offense" to suggest there is some reason "to suspect the individual of much more serious criminal conduct" (such as a defendant driving a car with a missing license plate, running a stop sign in an area where a burglary was recently reported, or failing to provide any identification). 4 Wayne R. LaFave, Search and Seizure § 9.5(a), at 260-61 n. 83 (3d ed. 1996 Supp. 2003) (footnotes omitted). *Page 600